**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

LEE P. ROBINSON,

      Petitioner,

v.                                      Case No. 8:17-cv-894-T-33JSS

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.
_____/

## ORDER

Lee P. Robinson, a Florida inmate, timely filed a *pro se* second amended petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his Hillsborough County convictions. (Doc. 11). Respondent filed a response (Doc. 21) and Robinson filed a reply (Doc. 30). Upon consideration, the petition will be DENIED.

### Procedural History

Robinson was convicted after a jury trial of first degree felony murder with a firearm, attempted robbery with a firearm, and burglary with a firearm. (Doc. 23, Ex. 1a, pp. 230-32). The state trial court sentenced him to an overall term of life in prison. (*Id.*, pp. 247-54). The state appellate court *per curiam* affirmed the convictions and sentences. (Doc. 23, Ex. 5). Robinson's motions for postconviction relief under Florida Rule of Criminal Procedure 3.850 were denied. (Doc. 23, Exs. 9-9c). The state appellate court *per curiam* affirmed. (Doc. 23, Ex. 13).

**Facts; Robinson's Theory Of Defense[1]**

On the night of June 14, 2007, Robinson and his friend Wesley Reeves picked up Ishla Daniels and Veandrea Smith, two women whom Robinson knew.  In the early morning hours of June 15, 2007, the four traveled in Smith's car to Mirage, a club in Tampa, and Daniels noticed a "bulge" near Robinson's right hip.  Robinson pointed to a man in the club's parking lot and asked Smith to talk to him.  Smith and Daniels ended up talking to two men, Granville Ritchie and Dwayne Simms.

Smith and Daniels rode with Ritchie in his car to the Village Motel in Tampa; Simms drove to the motel in his own car.   After Ritchie rented a two-bedroom motel room, Smith and Daniels went into the bathroom and talked about leaving.  When the men came in, Smith and Simms sat down on the bed in the front bedroom.  When Simms took his shirt off, Smith began rubbing his back.  She did not notice any weapon on Simms.

Saying they needed to use the phone, Smith and Daniels left the room and went outside.  Daniels called Robinson on her cell phone.  She told him that she was scared and wanted to leave.  Robinson responded that he could see her, but she could not see him.  Smith and Daniels began walking away.  Robinson rushed past them towards the room, with Reeves following behind him.  As they passed, Daniels noticed Robinson reach towards his right side.  When Smith and Daniels heard gunshots, they ran until they got to Smith's car, which Robinson had parked nearby.

Meanwhile, in the back bedroom, Ritchie "heard a little sound like [Simms] want [sic] to say something, but it didn't come out," followed by a gunshot.  (Doc. 23, Ex. 1d, p. 346).

---

[1] The factual summary is based on the trial transcript and appellate briefs.

Ritchie stood by the bathroom door but was able to look in a mirror and see the front bedroom.  Ritchie observed Simms "sliding" and trying to get away as Robinson continued to shoot.  (*Id.*, p. 347).  After Simms "dropped," Robinson ran from the room. (*Id.*, pp. 347-48, 350).  Ritchie denied that Simms had any type of weapon.  Ritchie did not see Simms and Robinson wrestling or struggling.

Robinson, Reeves, Smith, and Daniels left together in Smith's car.  As they drove away, Robinson said that "that wasn't supposed to happen" and that they "need[ed] to pray that [Simms] doesn't pass away."  (Doc. 23, Ex. 1e, pp. 415-16).

Simms died as a result of a gunshot wound.  During the day of June 15, Robinson and his wife, Felicia, picked up Smith and Daniels.  Robinson, who wanted to leave Tampa because of local news coverage of the murder, drove them to Gainesville.  During this time, Daniels recalled Robinson talking on the phone to an unidentified person using the word "lick," meaning robbery, in referring to the victim.  (*Id.*, p. 499).

Subsequently, Deputy United States Marshals arrested the four at a residence in Gainesville. When officers from the Tampa Police Department arrived, Robinson was handcuffed in the back of a police car.  Prior to receiving *Miranda*[2] warnings, Robinson talked to Detective Charles Massucci at the arrest scene and again at the Gainesville Police Department.  Later, Robinson received *Miranda* warnings, waived his rights, and gave a recorded interview to Detective Massucci.  During the interview, Robinson stated that he wanted money to pay his electric bill and he thought he could "rough the guys up a little" and that he was "going to grab . . . what I can and get and go."  (Doc. 23, Ex. 1g,

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

pp. 758, 775). Robinson said that Simms attacked him with a gun and that as they "wrestled over the gun", Robinson "pulled the trigger . . . to try to get [Simms] off me, to keep him from killing me." (*Id.*, p. 758).

Robinson met Scott McCombs in jail. McCombs testified at trial that Robinson said he went to the club to look for "some guys that . . . owed him some money" and that he used Daniels and Smith to lure Simms away from the club. (Doc. 23, Ex. 1f, p. 585). According to McCombs, Robinson said that when he walked into the motel room, he pulled the gun from his right hip area and demanded money. Robinson was startled when Simms approached him, and shot once. When Simms continued approaching, Robinson shot at Simms several more times before fleeing. Robinson later met with the others to "get their stories straight." (*Id.*, p. 587).

Robinson testified at trial that Daniels and Smith planned to go into Mirage and have some drinks, and that he agreed to pick them up later that night. He denied telling them to talk to any men. Robinson testified that he received a call from Daniels asking him to pick her up from the motel and that when he arrived, he saw Daniels and Smith standing outside of the room. He explained, "I just really want to know who [was] in the room. I want to know who they left with, you know, and I want to know, you know, if they are playing a game with me or what. . . . So I'm just curious of who [was] in the room. So I went into the room." (Doc. 23, Ex. 1h, pp. 912-13). When he went in, he stated, Simms jumped up and reached for something. Robinson testified that he did not take a gun into the room. He stated that he ran into Simms to stop him, and that they ended up "tussling and wrestling" with the gun. (*Id.*, p. 914). Robinson testified that the gun went off as he struggled to get it away from Simms. Robinson denied that he intended to commit a

robbery, saying that his statement about robbery was just a story he told police to "take the rap" so that his wife would be released from custody. (*Id.*, p. 924). Robinson also denied telling McCombs that he robbed anyone. Wesley Reeves testified that he did not see Robinson with a firearm and that they did not talk about committing a robbery. He stated that they came up with the robbery scenario because Robinson "felt guilty because [sic] the way things happened" and was willing to take the blame. (Doc. 23, Ex. 1g, pp. 849-50).[3]

## Standard Of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is an

---

[3] Reeves admitted that he previously gave inconsistent sworn statements to the Office of the State Attorney, and that he faced a perjury charge as a result.

"unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. *See also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed the judgment and sentence and the denial of postconviction relief without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir. 2002). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

### Exhaustion Of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims for relief by raising them in state court before presenting them in his petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v.*

*Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.").

The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). "If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). *See also Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) ("[F]ederal courts may treat unexhausted claims as procedurally defaulted, even absent a state court determination to that effect, if it is clear from state law that any future attempts at exhaustion would be futile. . . . A habeas petitioner can escape the procedural default doctrine either through showing cause for the default and prejudice . . . or establishing a 'fundamental miscarriage of justice.'").

**Discussion**

Ground One

Robinson argues that the state court erred in denying the motion to suppress his statements to Detective Massucci. Robinson claims that his unrecorded, pre-*Miranda* statements at the arrest scene and at the Gainesville Police Department were inadmissible because he made them while he was subjected to custodial interrogation without the benefit of *Miranda* warnings. He also alleges that his recorded, post-*Miranda* statements at the Gainesville Police Department should have been suppressed because the *Miranda*

warnings were insufficient. Finally, Robinson claims that "his pre-Miranda statements tainted his post-Miranda confession." (Doc. 11, p. 8).

The state court denied Robinson's motion to suppress:

A homicide occurred on June 15, 2007, at 4100 E. Hillsborough Avenue. The victim was identified as Dwayne Simms. The Defendant was developed as a suspect by the police and the Defendant was arrested in Gainesville by U.S. Marshal[ ]s on June 18, 2007. Detective[s] Massucci and Sandel were notified and arrived at the scene of the Defendant's arrest approximately 1 hour after being notified. It is undisputed the defendant had been arrested and was cuffed in a police unit when Detective Massucci arrived. According to Detective Massucci, he approached the Defendant who was in a police unit. The Defendant spontaneously told Detective Massucci he was the person the detective needed to speak to. It is uncontroverted the defendant was in custody and <u>Miranda</u> warnings had not been given to the Defendant. Detective Massucci testified he did not ask the Defendant any questions during this period other than asking him if he needed anything to drink.

The Defendant inquired about his wife's status at the time and made a statement about cooperating if his wife and [Smith and Daniels] could be released. According to Detective Massucci, he had 2 conversations with the Defendant while Defendant was in a police unit. Detective Massucci said the Defendant spoke to him after being transported to the Gainesville Police Department before a formal interview took place which was recorded. Testimony further developed that a tape recorded statement was taken from the Defendant which started at 3:45 P.M. and ended at 4:23 P.M. A transcript of that tape was admitted and the court has reviewed it as well as the tape recording itself.

The Defendant testified that he recalled being asked questions by Detective Massucci for approximately 45 minutes at the Gainesville Police Department before going on tape. The Defendant testified he responded to the questions the detectives asked. He also testified the detective never threatened him.

During the tape recorded conversation, the Detective told the Defendant the following regarding his Miranda warnings.

> Detective Massucci – Okay? Uh, your rights are that you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney, and if you cannot afford an attorney, one will be appointed to you at no cost. And what's most important to remember about those are if you choose to talk to us, at any

point you can stop talking to us meaning you can exercise these rights at any time.

Lee P. Robinson, Yes, Sir.

Detective Massucci -if I ask you something that you are uncomfortable with, if I ask you something that you don't wanna do.  You can either say, "No" you can either ask for a lawyer or you can either stop taking [sic], okay?

Lee P. Robinson, Yes, Sir.

Detective Massucci.  So with that being said, that was a lot you had to say before we went on tape.

Lee P. Robinson Yes, Sir.

The State argues that the statements the defendant made at the scene of his arrest were spontaneous and not the subject of interrogation.  The defense agrees with this therefore the court finds the statements the Defendant made at the scene of his arrest were not in response to custodial interrogation and are admissible.

The Defendant gave statements to Detective [sic] at the Gainesville Police Department before being given his Miranda warnings and also gave a tape recorded statements [sic] after Miranda was administered.  The court will deal with each separately.

<u>Statements made at the Gainesville Police Department pre Miranda</u>.
Detective Massucci testified he spoke with the Defendant for approximately one hour before the taped interview.  The detective testified the only questions he asked concern[ed] making the Defendant comfortable; he at no time asked any questions which would elicit an incriminating response.  The Defendant, on the other hand testified the detective asked him questions throughout the interview which he responded to.

The court listened to the recorded interview in an attempt to determine the exchange between Detective Massucci and the Defendant.  That interview consists of the Detective generally letting the Defendant tell Detective Massucci what occurred.  While the Detective does ask questions, most of the interview consists of the Defendant relating what occurred.  The court also had the opportunity to observe the demeanor of both Detective Massucci and the Defendant conclude [sic] the detective was clearly more credible.

The court finds that the Defendant's statements made at the Gainesville Police department pre Miranda were not the result of custodial interrogation. While it is clear the Defendant was in custody for purposes of <u>Miranda</u>, the court finds he was not subjected to custodial interrogation but volunteered the information to law enforcement. Therefore the Defendant's Motion to Suppress his out of court statements at the Gainesville Police Department before being given <u>Miranda</u> is <u>denied</u>.

<u>Defendant's taped interview post Miranda</u>
The Defendant gave a taped interview to the detective after being administered his <u>Miranda</u> warnings. The court earlier quoted the transcript which dealt with <u>Miranda</u>. It is clear the Defendant was never told he had the right to the presence of an attorney during questioning. The issue is whether the warnings given the Defendant comply with <u>Miranda</u>.

The State cites the recent case of Graham v. State, 2007 WL 4404945 (Fla. App 2 Dist) where the Second District found that warnings which informed the Defendant he had the right to an attorney without mentioning before answering any questions were not a violation of <u>Miranda</u>. The <u>Graham</u> case cites the case of Powell v. State, 32 FLW D 2418 (10-10-07) where the Second District found that warnings which informed a Defendant that he had a right to speak to an attorney before answering any questions did not comply with <u>Miranda</u>. The Second District felt that informing a Defendant he has the right to speak to an attorney before questioning does not tell him he has a right to counsel throughout any interrogation which is what Miranda requires. Thus the <u>Powell</u> court reversed the Defendant's conviction. The questions raised in <u>Powell</u> and a predecessor case M.A.B. v. State, 957 So 2d 1219 (Fla. 2 DCA 2007) have been certified to the Florida Supreme Court.

Miranda requires that a Defendant be informed he has the right to the presence of an attorney. Detective Massucci so advised the Defendant in this case. The case is controlled by <u>Graham</u>; therefore the rights given the Defendant complied with <u>Miranda</u>. The Defendant's Motion to Suppress his recorded statement is denied.

(Doc. 23, Ex. 1, pp. 176-80).

## 1. Robinson's Statements At The Arrest Scene

Robinson argues that his statements at the arrest scene should have been suppressed. The Court finds that this claim is unexhausted because Robinson failed to present it to the state trial court. As the state court's order discusses, Robinson conceded

that his statements at the arrest scene were spontaneous (and therefore not made in response to questioning), and did not challenge their admission. Accordingly, Robinson failed to exhaust this claim, even though he alleged on appeal that the state court erred in not suppressing these statements. *See, e.g., Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (to exhaust a claim, a petitioner must undertake "one complete round" of the state's review process). Because Robinson cannot return to the trial court to present this claim, it is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Robinson does not demonstrate that an exception applies to excuse the default. *See id.*

Even assuming that Robinson exhausted this claim by addressing it on direct appeal (*see* Doc. 23, Ex. 2, p. 33), Robinson cannot obtain relief. Detective Massucci testified that when he arrived in Gainesville, Robinson was handcuffed in the back of a police car. (Doc. 23, Ex. 1a, p. 272). When Detective Massucci told Robinson "who [he] was and where [he] was from," Robinson initiated a conversation and volunteered information. (*Id.*, p. 273). Robinson told Detective Massucci that he was the person Detective Massucci needed to talk to. (*Id.*). Detective Massucci told Robinson that he was conducting a homicide investigation. (*Id.*, pp. 273-74). Robinson began "attempting to negotiate" with Detective Massucci, indicating that if his wife was released, he would "tell [Detective Massucci] what . . . [Detective Massucci] needed to know." (*Id.*, p. 274). Detective Massucci also testified that Robinson asked questions about how police found him and expressed concern over the custody of his wife, Daniels, and Smith. (*Id.*).

Detective Massucci testified that none of Robinson's statements prior to his formal, recorded interview at the police station were made in response to any direct questioning. (*Id.*, pp. 273-75). Detective Massucci testified that the only questions he asked Robinson

prior to the recording involved Robinson's well-being, such as whether he needed water or whether his handcuffs were comfortable. (*Id.*, pp. 275, 280). Detective Massucci also stated that he only momentarily spoke to Robinson twice at the arrest scene, as he also worked on obtaining consent to search the residence, coordinating the investigation, and arranging transportation to the police department during the roughly 30 minutes he spent there. (*Id.*, pp. 279, 284). In contrast, Robinson testified that he never volunteered any information, and that he made all statements in response to direct questioning. (*Id.*, p. 305).

Because it is uncontested that Robinson was in custody when he made statements at the arrest scene, the question is whether Robinson was at that time subjected to interrogation:

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

Accordingly, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the *Miranda* decision]." *Miranda*, 384 U.S. at 478. In denying Robinson's motion, the state court found Detective Massucci's suppression hearing testimony credible. The credibility determination is a finding of fact that carries a presumption of correctness. "The factual findings of the state court, including the credibility findings, are presumed to be correct unless [a petitioner] rebuts the presumption by clear and convincing evidence." *Rolling v. Crosby*, 438 F.3d 1296, 1301

(11th Cir. 2006) (citing 28 U.S.C. § 2254(e)(1)). *See also Consalvo v. Sec'y, Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("Federal courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them. We consider questions about the credibility and demeanor of a witness to be questions of fact.") (internal quotation marks and citations omitted). Based on the testimony that the court found credible, Robinson was not subjected to interrogation at the arrest scene and therefore was not entitled to *Miranda* warnings.

Robinson attempts to rebut the presumption of correctness by identifying four statements, which, he argues, demonstrate that Detective Massucci lied when he testified that he did not question Robinson before giving him *Miranda* warnings. First, Robinson points to Detective Massucci's testimony that "I approached Mr. Robinson, started advising him of who I was and where I was from," and that, "[Robinson] initiated a conversation with me." (Doc. 23, Ex. 1a, p. 273). Robinson claims that these statements show Detective Massucci's lack of credibility because they are inconsistent and demonstrate that he did in fact question Robinson at the arrest scene. Read in its entirety, however, this portion of Detective Massucci's testimony refutes Robinson's allegation. Detective Massucci testified:

> When Detective Sandell (ph) and I arrived, I approached Mr. Robinson, started advising him of who I was and where I was from. At that point, he initiated a conversation with me, tried to volunteer a certain level of information.

(*Id.*).

Thus, Detective Massucci's testimony provides that although he introduced himself to Robinson, it was Robinson who began conversing and volunteering information. This testimony is not inherently inconsistent. Nor does it demonstrate that Detective Massucci

testified untruthfully at the suppression hearing.

Second, Robinson notes that in describing their communications at the arrest scene, Detective Massucci testified, "And basically we started a bartering or–he was attempting to negotiate with me and ultimately he was asking questions of me." (*Id.*, pp. 273-74). Robinson argues that the "use of 'we' indicates that [Detective] Massucci was negotiating a plea agreement." (Doc. 30, p. 23). This statement was made in the following context:

> Q. When Mr. Robinson - - after he made the statement [at the arrest scene] that he was the one you want to talk to, did you - - what did you do?
>
> A. Well, I concluded my introduction that this was a homicide investigation. He acknowledged that he understood this was a homicide investigation. And basically we started a bartering or - - he was attempting to negotiate with me and ultimately he was asking questions of me.
>
> Q. What were those questions?
>
> A. If we released his wife, that I would go ahead - - he would go ahead and tell me what I - - what he - - what I needed to know. Then he asked me throughout the course of the next hour questions such as, you know, how did we find him up there, how the other girls were involved. He was trying to get the other girls released out of custody.
>
> Q. Okay. And any of those statements, were any of those statements made in response to any sort of interrogation or questioning that you made to Mr. Robinson?
>
> A. Prior to going on tape?
>
> Q. Correct.
>
> A. No.

(Doc. 23, Ex. 1a, pp. 273-74).

This testimony reflects that while there was some interaction between Robinson and Detective Massucci, Robinson actively sought information about the investigation and also offered to provide information if his wife was released. Therefore, despite Detective

Massucci's use of the word "we," it does not appear that Detective Massucci interrogated Robinson or initiated negotiations, and no part of this testimony shows that Detective Massucci lacked credibility.

Third, Robinson notes Detective Massucci's testimony that one hour and 45 minutes elapsed between the time he arrived and the time the taped interview began. (Doc. 30, p. 23; Doc. 23, Ex. 1a, p. 274). Robinson appears to argue that it is incredible that he and Detective Massucci would have spent that much time together without Detective Massucci questioning him. But Detective Massucci testified that he was not with Robinson that entire time. As stated above, Detective Massucci explained that he was at the arrest scene for about 30 minutes, during which time he undertook numerous responsibilities. (Doc. 23, Ex. 1a, p. 284). Detective Massucci also testified that he did not drive Robinson from the arrest scene to the Gainesville Police Department and therefore had no contact with Robinson during the transport. (*Id.*, p. 276). He also clarified that although he had mentioned being in contact with Robinson for an hour, he was referring to "momentary conversations with [Robinson]"; that he "didn't speak to [Robinson] for an hour straight"; and that he only "spoke to [Robinson] on two occasions as he was handcuffed in the backseat of the car" at the arrest scene and "at least once, possibly twice while he was being held in a secure facility within the Gainesville Police Department." (*Id.*, pp. 278-79). Accordingly, Robinson fails to demonstrate that Detective Massucci's testimony was not credible based upon his statements about the timing of the events.

Fourth, Robinson asserts that Detective Massucci's testimony that he did not question Robinson prior to the recorded statement was inconsistent with Detective Massucci's comments at the start of the recording, where he said:

> Okay, Patrick,[4] we . . . talked about an hour or so ago at a place where you were detained, and we've been talking since before we went on tape . . . And ah I kinda told you that we're up here about a homicide . . . And I told you to make things official, I'd like to record it, which we are doing. And ah read you your rights.

(Doc. 23, Ex. 1, p. 137).

That Detective Massucci referenced talking before going on tape or making "things official" does not show that his suppression hearing testimony was untrue. Detective Massucci repeatedly told the court that although he made contact with Robinson, Robinson initiated communications in which he volunteered and sought information about the case.

Finally, Robinson contends in his reply that Detective Massucci "implied a promise to let Petitioner's wife go if Petitioner would submit to interrogations." (Doc. 30, p. 6). To the extent Robinson raises this allegation to support his challenge to the state court's credibility finding, in the sense that the statements Detective Massucci claimed were voluntary were actually the result of police coercion, Robinson cannot obtain relief.[5] Robinson first cites Detective Massucci's testimony on direct examination, quoted above, that Robinson said if police released his wife, he would tell them what they needed to know. Robinson also cites Detective Massucci's testimony on cross-examination:

> Q. Okay. And you introduce yourself as Detective Massucci, homicide detective?
>
> A. Yes.

---

[4] Robinson often went by Patrick, his middle name.

[5] To the extent Robinson may intend to raise an independent allegation that his statements should have been suppressed because they were coerced, he cannot bring a new claim in the reply. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court.") (citations omitted). Alternatively, and even assuming the claim is exhausted, Robinson cannot obtain relief for the same reasons addressed in the body of this Order.

Q.  Okay.  And you tell [sic] you're investigating a homicide?

A.  Yes.

Q.  Okay.  So you do give him some information?

A.  Yes.

Q.  Okay.  And at that point, he's expressing concern over his wife being handcuffed?

A.  Yes.

Q.  Okay.  And basically saying she doesn't have anything to do with this, can you get her out of the handcuffs?

A.  Yes.  With the added conversation of, "I'm the man - -

Q.  Okay.

A.  - - you want to talk to."

Q.  "I'm the man you want to talk to," right?

A.  Yes.

Q.  Okay.  And you actually do respond to what he says and you change where Ms. Robinson's handcuffs are located.  Do you move them - - and you put her in a more comfortable position at that point?

A.  No.  I believe her - - yes. Yeah.  We did make her - - we did put her in a car and did - - well, I know the handcuffs were moved up front once we were back at the station and ultimately removed.

Q: Okay.  And you did that at Mr. Robinson's request?

A: Generally, yes.

Q:  Okay.  Because you're trying to build, you know, a relationship at that point; some trust with Mr. Robinson?

A: Correct.

Q.  Okay.  And your contact with him at the scene in Gainesville at the apartment complex was limited, you weren't there for very long, right?

A.  Right.

(Doc. 23, Ex. 1a, pp. 283-84).

A confession is involuntary when the accused's "will has been overborne and his capacity for self-determination critically impaired."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).   "Police overreaching, mental coercion, and actual or implied promises–regardless of the motive of the person eliciting the confession–may render the statement obtained involuntary."  *United States v. Bailey*, 468 F.2d 652, 660 (5th Cir. 1972). A court should "consider the totality of the circumstances under which the statements were made and . . . ascertain whether the confession was the product of the defendant's free and rational choice."  *Id.*

These portions of the record do not indicate that Detective Massucci made any express or implied promises to Robinson that rendered Robinson's statements involuntary. Accordingly, Robinson has not demonstrated that Detective Massucci falsely testified at the suppression hearing that Robinson voluntarily spoke to him and gave him information.

In sum, Robinson fails to rebut, by clear and convincing evidence, the trial court's factual determination that Detective Massucci was credible.  The testimony that the court found credible establishes that, although in custody, Robinson was not subjected to questioning or its functional equivalent at the arrest scene.  Accordingly, *Miranda* was not required.   The state court's rejection of Robinson's claim was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of fact.

**2.**     **Robinson's Pre-*Miranda* Statements At The Gainesville Police Department**

Robinson claims that he was subjected to custodial interrogation without *Miranda*

warnings between his arrival at the Gainesville Police Department and the start of his formal interview.  Therefore, he argues, any statements made during this time should have been suppressed.

Detective Massucci testified that he spoke to Robinson once or twice at the police department prior to the formal interview.  (Doc. 23, Ex. 1a, p. 279).  Again, he testified that he did not question Robinson, but that Robinson asked him questions and spontaneously provided information.  (*Id.*, pp. 280, 286-87).  The state court found Detective Massucci's testimony to be credible, and as addressed, Robinson has not rebutted the presumption of correctness afforded to this factual finding by clear and convincing evidence.  *See Rolling*, 438 F.3d at 1301.  Accordingly, the testimony that the court deemed credible demonstrates that Robinson was not subjected to interrogation at the police station before he received *Miranda* warnings.  Robinson fails to show that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination.

**3.      Robinson's Post-*Miranda* Statements At The Gainesville Police Department**

Robinson claimed that his post-*Miranda* statements at the Gainesville Police Department should have been suppressed because he was not told during the administration of *Miranda* that he had the right to the presence of an attorney during questioning.   Robinson does not show that the state court's denial of this claim was contrary to clearly established federal law.  "Clearly established federal law" means the holdings of the United States Supreme Court at the time of the relevant state court decision.  *Williams*, 529 U.S. at 412. The relevant state court decision is the Second District Court of Appeal's *per curiam* affirmance of Robinson's conviction and sentence. That *per*

*curiam* affirmance was issued after the United States Supreme Court decided *Florida v. Powell*, 559 U.S. 50 (2010).[6] In addressing the language that officers must use when providing *Miranda* warnings, the Court stated in *Powell*:

> The four warnings *Miranda* requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed. . . . In determining whether police officers adequately conveyed the four warnings, we have said, reviewing courts are not required to examine the words employed as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'convey to a suspect his rights as required by *Miranda*.

*Id.* at 60 (internal quotation marks omitted).

In *Powell*, police told a suspect that, "You have the right to talk to a lawyer before answering any of our questions" and "You have the right to use any of these rights at any time you want during this interview." *Id.* at 54. The Supreme Court concluded that "[i]n combination, the two warnings reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times." *Id.* at 62. The warnings "were sufficiently comprehensive and comprehensible when given a commonsense reading" and thus communicated *Miranda*'s "essential message." *Id.* at 63, 64.

Here, Detective Massucci told Robinson that he had the right to an attorney, that he could exercise his rights any time, and that he could ask for a lawyer if he was uncomfortable. (Doc. 23, Ex. 1, p. 138). The state appellate court's determination that this language sufficiently conveyed to Robinson his right to an attorney during questioning was not contrary to clearly established federal law or based on an unreasonable determination

---

[6] Although the Second District Court of Appeal's decision did not discuss Robinson's claim, a state court need not cite, or even be aware of, Supreme Court decisions "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

of the facts.

**4. Whether Robinson's Pre-*Miranda* Statements Tainted His Post-*Miranda* Statement**

Robinson alleges that the court erred in denying his motion to suppress because his pre-*Miranda* statements tainted the voluntariness of his post-*Miranda* statement. This claim is unexhausted because Robinson did not clearly present it in his motion to suppress or during argument at the suppression hearing. (Doc. 23, Ex. 1, pp. 41-46; Ex. 1a, pp. 295-300). Further, Robinson made a cursory reference to this argument in his appellate brief, but did not elaborate on it or cite any authority to support it. (Doc. 23, Ex. 2, pp. 29-39). Therefore, the claim was not fairly presented to the state courts. Because Robinson cannot return to state court to present this claim, it is procedurally defaulted. *See Smith*, 256 F.3d at 1138. Robinson has not argued or shown that an exception applies to excuse the default. *See id*.

Alternatively, notwithstanding the default, Robinson fails to show entitlement to relief. Robinson has offered no facts or argument in support of his claim, and does not explain why he believes his pre-*Miranda* statements tainted his post-*Miranda* statements. And assuming that he refers to the type of situation addressed in *Missouri v. Seibert,* 542 U.S. 600 (2004), he fails to show any impropriety that would have been a basis for suppression. *Seibert* holds that if police deliberately withhold *Miranda* warnings during custodial interrogation and elicit a confession, then provide *Miranda* and again obtain a confession, the second, post-*Miranda* confession will be inadmissible. *Ia.* at 604. But Robinson points to no record evidence indicating such a deliberate tactic, and as addressed, he has failed to establish that he was subjected to custodial interrogation before he received

*Miranda* warnings.  Accordingly, Robinson is not entitled to relief on Ground One.

*Ineffective Assistance Of Counsel*

The rest of Robinson's claims allege ineffective assistance of trial counsel.  Claims of ineffective assistance are analyzed under the test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* requires a showing of deficient performance by counsel and resulting prejudice.  *Id.* at 687.  To show deficient performance, Robinson must demonstrate that "counsel's representation fell below an objective standard of reasonableness."  *Id.* at 687-88.  A court must consider whether, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance."  *Id.* at 690.  However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Robinson must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691-92.  He must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694. Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted).  *See also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (this doubly deferential standard of review "gives both the state court and the defense attorney the

benefit of the doubt.").

Ground Two A

Robinson claims that trial counsel was ineffective in failing to argue that police should have provided him with *Miranda* warnings upon arrest, and that his initial statements at the arrest scene should have been suppressed because he made them while subjected to custodial interrogation without *Miranda*. The state court denied this ground:

> In ground Seven A, Defendant asserts counsel was ineffective for failing to argue that *Miranda* warnings should have been read to him when he was taken into custody. Defendant argues counsel should have argued that the purpose of *Miranda* warnings is to protect a suspect from spontaneously incriminating himself even if he is not being interrogated. First, the Court notes that *Miranda* warnings are implicated only when an individual is undergoing actual custodial interrogation by the police. *Ramsey v. State*, 731 So. 2d 79, 81 (Fla. 3d DCA 1999) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)); *see also Sapp v. State*, 690 So. 2d 581 (Fla. 1997). Although the Defendant was in custody, Detective Charles Massucci testified that Defendant's statements were spontaneous and not in response to any question. Additionally, a review of the record indicates that counsel filed a motion to suppress these statements, arguing Defendant should have been read his *Miranda* rights. The Court denied the motion. Consequently, Defendant is not entitled to relief on this claim.

(Doc. 23, Ex. 9, p. 121) (court's record citations omitted).

The state court did not unreasonably deny this claim. Robinson fails to show that counsel was ineffective for not arguing that police were required to provide him with *Miranda* at the scene of his arrest. As addressed in Ground One, *supra*, *Miranda* warnings are required when a person in custody is subjected to interrogation, but Robinson was not subjected to interrogation at the arrest scene. Accordingly, Robinson has not shown that counsel was ineffective.

Robinson, again apparently in an effort to challenge Detective Massucci's credibility, argues that Detective Massucci's own statements show he testified falsely. But Robinson

cannot show that counsel was ineffective in not addressing such statements.[7]  Counsel challenged the accuracy of Detective Massucci's testimony that he did not question Robinson before the recorded interview, arguing that Detective Massucci's recounting of events simply was not credible:

> [COUNSEL]:  I do believe that once they go to the police department and he is waiting to be questioned that we have no transcript of what actually occurred and we're left with Detective Massucci's testimony that he's making no questions to him, that this is going on for 45 or so minutes and that, you know, Mr. Robinson is just continuing to give information.  I don't - - I don't believe that that is, you know, reliable considering he did question him later and this is a homicide suspect and that he just had him, that someone is trying to give all of this information and they're just waiting and they interview other people.  What would make more sense is that Detective Massucci is trying to get some information out of Mr. Robinson before he goes and speaks to these other people that are possible suspects in the case to see what their role is in this - - in what went on at the Village Motel.  And by Detective Massucci himself, he says he never read him Miranda before what was on the recording.
>
> . . .
>
> THE COURT: So you're saying as to - - what you're saying is that - - Detective Massucci testified and I asked him specifically that very question, "Did you question him?" And he said, "Not other than do you want coffee or something or are your cuffs all right", nothing specific in response to questions.  I asked him the specific question.  And under oath, he gave me an answer.  Would you agree or disagree?
>
> [COUNSEL]: I agree with that.
>
> THE COURT: You're saying reject that testimony - -
>
> [COUNSEL]: Yes.
>
> THE COURT:  - -I don't believe it's credible?

---

[7] Robinson failed to cite these statements in his postconviction motion.  (Doc. 23, Ex. 9, pp. 57-58). To the extent Robinson's claim relies on the identified statements, the claim was not fairly presented to the state court and is therefore unexhausted.  *See Weeks v. Jones*, 26 F.3d 1030, 1044-46 (11th Cir. 1994). Notwithstanding the lack of exhaustion and the subsequent procedural default, Robinson is not entitled to relief for the reasons discussed.

[COUNSEL]: Yes.

(Doc. 23, Ex. 1a, pp. 296, 299-300).

Robinson repeats the first four statements by Detective Massucci that he raised in Ground One, *supra*, apparently arguing that counsel should have pointed them out in support of her claim that Detective Massucci lied when he testified that he did not question Robinson before providing *Miranda* warnings. For the same reasons addressed in Ground One, however, none of these statements shows that Detective Massucci testified falsely at the suppression hearing. Accordingly, Robinson does not show a reasonable probability that the outcome would have been different had counsel referenced any of the identified statements in arguing that Detective Massucci was not credible.

Robinson does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying this claim. He is not entitled to relief on Ground Two A.

Ground Three

In a similar claim, Robinson argues that trial counsel was ineffective in conceding that his statements at the arrest scene were spontaneous. The state court denied this claim:

> In ground eight, Defendant alleges counsel was ineffective for conceding that statements made by Defendant at the scene of his arrest were spontaneous and not in response to any questions. . . . Counsel for Defendant stated the following:
>
>> Your Honor, there's – obviously there's three different times when there's statements made that we need to deal with, the first being when Detective Massucci showed up at the apartment complex and the statements made by Mr. Robinson per Detective Massucci that I'm the man you're looking for . . . I'm not arguing those first statements that are made at the

scene in Gainesville at the apartment complex.  I don't believe
there's any issue with those. . . .

At trial, Defendant testified that he told the detectives what he thought they
wanted to hear so that his wife would be released.  After considering the
record, the Court finds Defendant has failed to demonstrate how he was
prejudiced by counsel conceding that this statement was spontaneous.  As
such, ground eight is denied.

(Doc. 23, Ex. 9, pp. 122-23) (court's record citations omitted).

The state court did not unreasonably apply *Strickland*'s prejudice prong in denying

Robinson's claim.  Even if counsel had not conceded that Robinson's comments at the

arrest scene were spontaneous, Robinson fails to show a reasonable probability that the

court would have granted a motion to suppress these statements because Detective

Massucci, whom the court found credible, testified that Robinson volunteered the

information.  As Robinson has not shown that the state court's denial of his claim involved

an unreasonable application of *Strickland* or was based on an unreasonable factual

determination, he is not entitled to relief on Ground Three.

Ground Two B

Robinson contends that counsel was ineffective in failing to call Ishla Daniels,

Veandrea Smith, and his wife Felicia Robinson to testify at the suppression hearing that

Detective Massucci questioned them without first providing *Miranda* warnings.  Robinson

contends that their testimonies would have "show[n] Detective Massucci's specific

interrogatory techniques, i.e. ask questions first, then Mirandize" and that evidence of such

a pattern would have "effectively impeached [Detective] Massucci's credibility" at the

suppression hearing.  (Doc. 11, p. 15).

Robinson quotes what he claims are portions of Daniels's and Smith's police

interview transcripts showing that Detective Massucci questioned them before providing

*Miranda*.  First, Robinson cites the following exchange, which he alleges is from Daniels's

interview:

> **Massucci**: "Okay.  Why don't we start out by you sort of generally telling how long you've known Patrick and these other people?"

> **Daniels**: ". . . So when he did that, I guess that's the first shot that I heard.  He said he still had him.  And when he still had him, he was like, 'He wouldn't let go.' 'He wouldn't let go for anything.  They were n [sic] there fighting' for the gun.  And he said that's when he shot some more and then that's when I guess I seen him jump the fence. . ."[8]

> **Massucci**: "Before I ask you direct questions, I wasn't [sic] to go ahead and read you your rights, advise you of them, Okay?"

(Doc. 30, p. 27).

Robinson also cites the following portion of what he claims is Smith's interview:

> **Massucci**: Okay. We've been talking here for probably 20-30 minutes before we went on tape, and uh, about the events that occurred at the [V]illage [M]otel and the [M]irage correct?

> **Veandrea Smith**: "Mm-hmmm..."

> **Massucci**: "And I told ya I had a couple specific questions to ask you on that matter and I was gonna read you your rights or advise you of your right before I asked you questions.  Correct?"

> **Veandrea Smith**: "Yes."

> **Massucci**: "Okay.  I'm gonna do that once for the record, and then, uh, we'll talk about everything that happened that we've been talking before we went on tape."

(*Id.*, pp. 27-28).

The state court denied Robinson's ineffective assistance claim:

---

[8] Daniels testified at trial that after she fled from the motel to Smith's car, she saw Reeves and Robinson both jump over a fence as they approached the car.  (Doc. 23, Ex. 1e, p. 486).

In ground seven B, Defendant argues counsel was ineffective for failing to call Defendant's wife, as well as Veandrea Smith and Ishla Daniels to testify at the hearing on his motion to suppress. Defendant asserts that at the hearing, Detective Massucci testified that Defendant's statements were spontaneous and not in response to any questions, but Defendant testified that Detective Massucci did question him before reading him his *Miranda* rights. Defendant argues that counsel should have called his wife, Ms. Smith, and Ms. Daniels to testify that they were each questioned prior to having their rights read to them. Defendant argues this would have established a pattern that Detective Massucci questions suspects prior to reading them their rights. The Court finds that even if this testimony was presented, it would not establish the sequence in which Defendant was read his rights and questioned. Therefore, Defendant has failed to demonstrate that the outcome of the suppression hearing would have been different, and ground seven B is denied.

(Doc. 23, Ex. 9, p. 121).

Robinson does not show that the state court's denial of his claim was unreasonable. Initially, he has not presented any evidence of what Felicia Robinson would have testified to. Nor has he provided the transcripts of Daniels's and Smith's police interviews, or any evidence of what Daniels and Smith would have testified to at the suppression hearing. Without evidence of their proposed testimonies, his claim is too speculative to warrant relief. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'" (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985))); *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) ("[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative."). And neither excerpt provided by Robinson indicates that the prospective witnesses would have in fact testified

that, while in custody, Detective Massucci interrogated them about the case without first reading them their rights under *Miranda.* Therefore, Robinson cannot show that the prospective witnesses' testimonies would have established that Detective Massucci routinely engaged in such questioning, thereby undermining his credibility such that there is a reasonable probability the outcome of the suppression hearing would have been different.

Additionally, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one [a reviewing court] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995). Robinson fails to show that counsel's decision not to call the prospective witnesses was "patently unreasonable." *See Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (stating that counsel's strategic decision "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it.") (quotations omitted). Since Robinson does not establish that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief on Ground Two B.

Grounds Four, Five, And Six

Grounds Four, Five, and Six allege ineffective assistance of counsel in connection with the burglary charge. Because many of the claims raised in these grounds overlap, the Court will address the grounds together.

**1.      Jury Instruction On Burglary**

Robinson was charged in count three with burglary with a firearm. The Florida Supreme Court has clarified that the essential elements of burglary are entering or

remaining in a structure or conveyance with intent to commit an offense therein. *State v. Waters*, 436 So.2d 66, 69 (Fla. 1983). Consent to entry is an affirmative defense to burglary. *State v. Hicks*, 421 So.2d 510, 510-11 (Fla. 1982) ("We hold that consent to entry is an affirmative defense to, rather than an essential element of, burglary."). But a prior version of the standard jury instruction, in effect before July 12, 2007, treated lack of consent as an element that the State had to prove. It stated:

> To prove the crime of Burglary, the State must prove the following **three elements** beyond a reasonable doubt:
>
> 1. (Defendant) entered a [structure] [conveyance] owned by or in the possession of (person alleged).
>
> **2. (Defendant) did not have the permission or consent of (person alleged), or anyone authorized to act for him, to [enter] [remain in] the [structure] [conveyance] at the time.**
>
> 3. At the time of entering the [structure] [conveyance] (defendant) had a fully-formed, conscious intent to commit the offense of (the crime alleged) in that [structure] [conveyance].

Fla. Std. Jury Inst. (Crim.) 13.1 (2003) (emphasis in bold added).

This instruction was amended effective July 12, 2007. The amendment clarified that the crime of burglary consisted of two elements, and in recognition of consent as an affirmative defense, created an optional third "element" the State was required to prove *only if* the defendant established consent to entry:

> To prove the crime of Burglary, the State must prove the following **[two] [three]** elements beyond a reasonable doubt:
>
> 1. (Defendant) entered a [structure] [conveyance] owned by or in the possession of (person alleged).
>
> 2. At the time of entering the [structure] [conveyance], (defendant) had the intent to commit [an offense] [the crime alleged] in that [structure]

[conveyance].

. . .

**_Give element 3 only if defendant meets his or her burden of production_**
**_that he or she had an invitation or license to enter . . . See State v._**
**_Hicks, 421 So.2d 510 (Fla. 1982) and State v. Waters, 436 So.2d 66 (Fla._**
**_1983)._**

**3. (Defendant) was not [licensed] [invited] to enter the [structure]**
**[conveyance]. . .**

Fla. Std. Jury Inst. (Crim.) 13.1 (2007) (emphasis in bold added).

The amendment was intended to draw the instruction into line with the definition of

burglary, as clarified by the Florida Supreme Court. When the Committee on Standard Jury

Instructions in Criminal Cases submitted the amendment to the Florida Supreme Court, it

explained that the standard instruction was "amended to redefine the elements of burglary

with regard to consent in accordance with the decisions in" _Hicks_ and _Waters._[9]   In

accordance with the amended version, Robinson's jury was instructed during his November

2008 trial that the State had to prove beyond a reasonable doubt that 1) he entered a

building in Simms's possession, and 2) at the time of entry, he had the intent to commit an

offense. As Robinson did not present a defense of consent to entry, the "third element"

was not read to the jury. (Doc. 23, Ex. 1a, pp. 215-16).

Robinson's jury was also instructed, again consistent with the standard instruction,

that they "may infer that [Robinson] had the intent to commit a crime inside the building if

he entered stealthily and without the consent of the owner or occupant." (Doc. 23, Ex. 1a,

---

[9] _See_ Report No. 2006-02, Committee on Standard Jury Instructions in Criminal Cases, p. 8, available
at: https://www.floridasupremecourt.org/Case-Information/Archive-Rules-Cases/2006-Rules-Cases (select
case number SC06-2303) (last visited July 26, 2019).

p. 216).

2.    **Robinson's Claims**

Robinson claims that counsel was ineffective in not arguing to the jury and to the court in the motion for judgment of acquittal that he had implied consent to enter the motel room.  Robinson also claims that counsel was ineffective in failing to inform him that implied consent was a defense to burglary.

Robinson further argues that counsel was ineffective with respect to the jury instruction on burglary.  He contends that counsel was ineffective in 1) not requesting an instruction on consent; 2) not objecting to the instruction because it was missing an essential element of burglary and because he was entitled to the prior version of the instruction, which was in effect at the time the offense occurred; 3) not objecting because the burglary instruction did not specify the crime that he intended to commit in the motel room; and 4) not objecting to the language about inferring Robinson's intent to commit an offense.  Robinson claims that the inference language was "unfair" and "confusing" and that, as a result, his "presumption of innocence was tainted as the jury perceived him as entering the premises stealthily, as opposed to lawfully which would have provided credence to his sole defense or self-defense." (Doc. 11, pp. 34, 35).

The state court addressed several of these claims together in one discussion following an evidentiary hearing:

> [Defendant] asserts he testified at trial that he thought his friends had rented the hotel room and that he had permission to enter because they had called him to pick them up.  He argues that his friends were legal occupants of the hotel room, and that he had implied consent to enter.  He asserts counsel should have requested a jury instruction on consent to enter.  It also appears he is asserting counsel should have argued in a motion for judgment of acquittal and during closing arguments that the State failed to disprove his

consent to enter defense.

At the evidentiary hearing on 12 April 2015 the State called . . . Defendant's trial counsel. When asked why she did not request that a consent instruction be given in this case, [counsel] testified to the following:

> [COUNSEL]: The reason why I didn't request anything regarding consent is because our strategy at trial was that when the two women involved in this case went to a hotel or left a club unknowing to Mr. Robinson and Mr. Re[e]ves at the time, what my client told me was that the reason why he went to go into that room was basically to check in that room and to see if the girls were playing with him or if they had made everything up.
>
> There wasn't anything specific about whether they had rented the room or somebody else rented the room. There were some different communications about that. But our defense was that he never entered that room in an effort to do any type of crime, that he was just going in there to check to see if the girls were playing.
>
> The video that was introduced at trial show[s] the two girls outside of the room at the time when Mr. Robinson arrives and never were they inside of the room. The girls were outside on the phone with him. They walk pas[t] him and then he walks in towards the room.

[Counsel] testified that a request for a consent instruction would have been inconsistent with the defense presented, specifically, Defendant's lack of intent to commit a crime. She testified that she discussed this defense with Defendant beforehand. She further testified that there was no testimony at trial that anyone in the hotel room ever invited or allowed Defendant to enter the room, nor any other evidence adduced at trial that would have prompted her to ask for a consent instruction.

On cross-examination [counsel] testified that she "would have considered all options as far as any defense goes." She also testified that requesting a jury instruction on consent would have affected the credibility of Defendant's case.

Additionally, on cross-examination Defendant testified in pertinent part as

follows:

| | | |
|---|---|---|
| STATE: | | I actually asked you at trial whether or not you had permission to enter the hotel room that evening, didn't I? |
| DEFENDANT: | | You asked me that question, yes, ma'am. |
| STATE: | | Right. And you answered no, nobody gave you permission to enter the room, correct? |
| DEFENDANT: | | I said that. |
| STATE: | | Was that a lie? |
| DEFENDANT: | | No. I said - - I said that, but that's not - - I mean implied consent and direct consent is two different things, too, ma'am. |
| STATE: | | Let me stop you. I'm asking you a very specific direct question. |
| DEFENDANT: | | Right. |
| STATE: | | I asked you at trial whether ever anybody gave you permission to enter the hotel room and you said no. |
| DEFENDANT: | | You asked me that, yes, ma'am, and I said no. |

Defendant failed to meet the two prong test set forth in *Strickland*. When asserting a claim of ineffective assistance of counsel, a defendant must prove that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

In conducting a review there is a strong presumption that trial counsel's performance was not ineffective, and a defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might' be considered sound trial strategy." *See Strickland*, 466 U.S. at 690 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected, and if a decision by counsel was

reasonable under the norms of professional conduct." *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000).

Trial counsel made a strategic decision to proceed without requesting a jury instruction on consent. She knew it would be contradictory and harmful to the credibility of their lack of intent defense to raise a consent issue. This strategic decision was reasonable. Defendant cannot satisfy the deficiency prong of *Strickland*.

No relief is warranted.

(Doc. 23, Ex. 9a, pp. 330-33) (court's record citations omitted).

Robinson does not show that his counsel was ineffective in not raising a consent defense. First, he fails to show that consent was a viable defense. A defendant carries the burden to establish consent. *Jones v. State*, 745 So.2d 403, 404 (Fla. 3d DCA 1999) ("Consent is an affirmative defense to burglary. . . . Thus, the burden was on Jones to establish this defense."). As the state court's order notes, however, Robinson's trial testimony reflects his awareness that he lacked permission to enter the room. (*See* Doc. 23, Ex. 1h, p. 948). And counsel's testimony, addressed in the state court's order, indicates that the information available to her did not establish that Robinson had consent.

But the information before counsel did support the defense that the State failed to prove intent to commit an offense. According to counsel's testimony, Robinson consistently maintained that he only went into the room to see if anyone was inside and that he never had the intent to commit a crime inside the room. (Doc. 23, Ex. 9a, pp. 293, 301-02). Accordingly, counsel chose to pursue to this defense.

Robinson does not rebut, by clear and convincing evidence, the state court's finding that counsel made a strategic decision not to raise consent. *See DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1273 (11th Cir. 2014) (a question "regarding whether an

attorney's decision is 'strategic' or 'tactical' is a question of fact."). Given the lack of information before counsel suggesting that Robinson had permission to enter the motel room, as well as the availability of another defense, counsel's strategic decision to forgo a consent defense was not patently unreasonable. *See Dingle*, 480 F.3d at 1099. *See also Chandler v. United States*, 218 F.3d 1305, 1314-15 (11th Cir. 2000) ("[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy. . . . [B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.") (internal quotation marks and citation omitted).

Further, because Robinson presented the defense that the State failed to establish one of the elements of burglary–that the State could not prove that he had the intent to commit an offense when he entered the room–as counsel testified, it would have been inconsistent to present the affirmative defense of consent. *See Burnette v. State*, 901 So.2d 925, 927 (Fla. 2d DCA 2005) ("An affirmative defense does not involve proof of the elements of the offense, but rather *concedes the elements* while raising other facts that, if true, would establish a valid excuse or justification, or a right to engage in the conduct in question.") (emphasis added). *See also State v. Cohen*, 568 So.2d 49, 51-52 (Fla. 1990); *Walker v. State*, 701 So.2d 1258, 1258-59 (Fla 5th DCA 1997). Counsel was not ineffective in declining to present inconsistent defenses. *See Johnson*, 256 F.3d at 1181 ("As we have explained . . . '[a]lthough inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury.' To argue [an alternative theory] might well have undercut the

credibility of Johnson's lawyers with the jury." (quoting *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988))).

Further, Robinson fails to show that counsel was ineffective in not raising consent in her motion for judgment of acquittal because "[t]he issue of an affirmative defense should not be resolved by a judgment of acquittal and should be submitted to the jury where the facts are disputed." *Turner v. State*, 29 So.3d 361, 364 (Fla. 4th DCA 2010). Additionally, a court "should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." *Lynch v. State*, 293 So.2d 44, 45 (Fla. 1974). Considering the evidence presented in the light most favorable to the State, Robinson fails to show that a motion for judgment of acquittal would have succeeded.[10]

Robinson has not demonstrated that counsel was ineffective failing to inform him that implied consent was an available defense to burglary, as counsel made a reasonable strategic decision not to pursue that defense. Similarly, Robinson has not established that counsel should have requested an instruction on consent in light of the defense strategy.[11]

---

[10] Robinson appears to argue that the state court did not expressly resolve some of his claims, including whether counsel was ineffective in not moving for a judgment of acquittal based on consent, in not objecting to a missing element in the jury instruction, and in not informing him of the consent defense. Even assuming that the state court failed to rule on the merits of any of his claims, and that *de novo* review is therefore warranted, *see Davis v. Sec'y, Dep't of Corr.*, 341 F.3d 1310, 1313 (11th Cir. 2003), Robinson has failed to establish entitlement to relief for the same reasons discussed in the body of this Order.

[11] Robinson claims that counsel admitted she should have asked for a consent instruction. Counsel was asked, "Would there have been any harm done to Mr. Robinson's case by requesting a jury instruction on consent or moving for a judgment of acquittal on that basis?" (Doc. 23, Ex. 9a, p. 302). She answered, "No, other than credibility. But yeah, there wouldn't have been any harm." (*Id*). She later explained that a consent instruction would have impacted her credibility with the jury by "detract[ing]" from the defense presented. (*Id.*, p. 310). Even if counsel's initial response can be read as an acknowledgment that she should have proceeded differently, it is insufficient to establish ineffective assistance. *Cf. Chandler v. United States*, 218 F.3d 1305, 1315 n.16 (11th Cir. 2000) (because the ineffective assistance inquiry is objective, counsel's admission of deficient performance "matters little"); *Walls v. Bowersox*, 151 F.3d 827, 836 (8th Cir. 1998) (trial counsel's concession of ineffectiveness was not decisive in an ineffective assistance claim).

Nor does Robinson demonstrate that counsel should have objected on the basis that the instruction was missing an element of burglary; as addressed above, the instruction was consistent with Florida's standard instruction and did not misstate the elements of burglary.

Robinson now argues that counsel was ineffective in not objecting on the basis that, because the offense occurred on June 15, 2007, before the amendment to the standard instruction, he was entitled to the prior version of the instruction. This specific claim is unexhausted due to Robinson's failure to raise in state court. (Doc. 23, Ex. 9, pp. 42-45, 53-54,80-82, 88, 96-98). Robinson cannot return to state court to present the claim in an untimely postconviction motion. *See* Fla. R. Crim. P. 3.850(b). Robinson has not shown that an exception applies to excuse the resulting procedural default. *See Smith*, 256 F.3d at 1138. Alternatively, Robinson fails to show entitlement to relief.

The Florida Supreme Court determined that the standard instruction, as amended in July 2007, should be used for offenses committed after July 1, 2001. *See In re Standard Jury Instructions in Criminal Cases–Report No. 2006-2*, 962 So. 2d 310, 326 (Fla. 2007). Specifically, the court's comments provide that the standard instruction, amended in 2007, "should be given for offenses committed after July 1, 2001." *See id.* The instruction read to Robinson's jury was consistent with the amended standard instruction and therefore complied with the Florida Supreme Court's directive. Accordingly, Robinson has not shown that his counsel was ineffective in failing to object to the amended instruction on the basis that he was entitled to an earlier version, or a reasonable probability that any objection would have been granted.

Nor does Robinson show that counsel was ineffective in not objecting to the burglary instruction because it failed to specify the intended offense, or because it included the

standard language about inferring intent.  The state court rejected both of these claims:

> In grounds six B and six C, Defendant asserts counsel was ineffective for failing to object to the following instruction because it was improper and created an unfair inference: "You may infer that [Defendant] had the intent to commit a crime in that building if he entered stealthily and without the consent of the owner or occupant . . . Even though an unlawful entering of a building is proved, if the evidence does not establish that it was done with the intent to commit an offense, Lee Patrick Robinson, Jr. must be found not guilty of burglary."  However, the Court finds this instruction was proper, and Defendant is not entitled to relief on these claims.

(Doc. 23, Ex. 9, p. 120) (court's record citation omitted).

> In ground fourteen, Defendant alleges counsel was ineffective for failing to object to the burglary jury instruction because it failed to specify the offense intended to be committed at the time of entry.  However, the standard burglary instruction in effect at the time of Defendant's trial did not require specification of the offense intended.  It was sufficient that the Court instructed the jury that at the time of entering the structure defendant had the intent to commit "an offense."  *See* Fla. Std. Jury Inst. (Crim.) 13.1 (2008). Further, the jury also found Defendant guilty of attempted robbery.  After considering Defendant's claim and the record, the Court finds Defendant is not entitled to relief on this claim.

(Doc. 23, Ex. 9a, p. 256) (court's record citation omitted).

The state court's finding that the instructions were proper involves a determination of Florida law to which this Court must defer.  "It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355 (11th Cir. 2005) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).  Accordingly, "[a]lthough an ineffective-assistance-of-counsel claim is a *federal* constitutional claim, which we consider in light of the clearly established rules of *Strickland*, when 'the validity of the claim that [counsel] failed to assert is clearly a question of *state* law, . . . we must defer to the state's construction of its own law.'" *Will v. Sec'y, Dep't of Corr.*, 278 Fed. App'x 902, 908

(11th Cir. 2008) (quoting *Alvora v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)).

Accordingly, Robinson fails to demonstrate that his counsel was ineffective.

Robinson has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claims. He is not entitled to relief on Grounds Four, Five, or Six.

Ground Seven

Robinson alleges that trial counsel was ineffective in failing to strike jurors 5 and 9 for bias.[12] The state court denied this claim when Robinson raised it in his initial postconviction motion:

> In ground one of his motion, Defendant alleges counsel was ineffective for failing to challenge for cause jurors five and nine. Defendant argues juror number five, Annette Moyd, indicated she would have difficulty being impartial if a gun was involved in the crime charged. During jury selection, Ms. Moyd stated she despises guns. Counsel for Defendant replied, "Okay. But just because there is a gun involved doesn't mean you couldn't weigh this evidence and have an open mind, just because you personally don't like guns?" Ms. Moyd answered, "No." Ms. Moyd later stated that she believed people should be able to defend themselves.[13] After reviewing the record

---

[12] Robinson's claim is not exhausted as to juror 9 because he did not present any argument regarding juror 9 on collateral appeal. (Doc. 23, Ex. 10, pp. 22-24). *See Leonard v. Wainwright*, 601 F.2d 807, 808 (5th Cir. 1979) ("In Florida, exhaustion usually requires not only the filing of a Rule 3.850 motion, but an appeal from its denial."). Robinson concedes the resulting procedural default, but he has not shown that an exception applies to excuse it. Notwithstanding the default, however, Robinson cannot obtain relief on this claim for the reasons discussed in the body of this Order.

[13] During voir dire, counsel addressed self defense with some of the prospective jurors:

PROSPECTIVE JUROR NO. 13: You have to defend yourself.

[COUNSEL]: Okay. Miss Moyd, you're shaking your head or nodding, juror number five, what are your thoughts?

PROSPECTIVE JUROR NO. 5: I agree with her.

[COUNSEL]: Okay. Tell me what your thoughts are?

PROSPECTIVE JUROR NO. 5: About two weeks ago I was in the same situation where a

the Court finds counsel was not ineffective for failing to challenge juror five for cause.

Defendant asserts juror number nine, Trenton Roudabush, demonstrated bias when he indicated that he could not listen and fairly weigh the testimony of a convicted felon. During voir dire, the Assistant State Attorney asked, "And would you completely discredit someone because they are a convicted felon?" Mr. Roudabush responded, "No. I think I have a gut feeling whether someone is lying. I think I could objectively listen." After considering the record, the Court finds these statements did not provide grounds to challenge Mr. Roudabush for cause. As such, Defendant is not entitled to relief on this claim.

(Doc. 23, Ex. 9, pp. 116-17).

When Robinson addressed the claim in his amended motion, the state court found:

In Defendant's supplement to ground one of his December 29, 2011 motion for postconviction relief, Defendant alleges counsel was ineffective for failing to challenge for cause jurors five and nine. Defendant argued in his December 29, 2011 motion that juror number five, Annette Moyd, indicated she would have difficulty being impartial if a gun was involved in the crime charged, and juror number nine, Trenton Roudabush, demonstrated bias when he indicated that he could not listen and fairly weigh the testimony of a convicted felon. Defendant argues counsel should have challenged for cause juror Roudabush because counsel was aware that Wesley Reeves, a three time convicted felony, would be called to testify at trial. However, as noted in the Court's previous order, when asked whether he would completely discredit someone because they are a convicted felon, Mr. Roudabush responded, "No. I think I have a gut feeling whether someone is lying. I think I could objectively listen." After considering the record, the Court finds this statement did not provide grounds to challenge Mr. Roudabush for cause. As such, Defendant is not entitled to relief on this claim.

---

friend of mine - - two friends of mine, she killed him because he broke into her house . . .

[COUNSEL]: Okay. So someone tried to break in her home?

PROSPECTIVE JUROR NO. 5: And she killed him.

[COUNSEL]: Any problem with that?

PROSPECTIVE JUROR NO. 5: No.

(Doc. 23, Ex. 1c, pp. 206-07).

(Doc. 23, Ex. 9a, p. 259) (court's record citation omitted).

"The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors." *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (internal quotation marks and citation omitted). "The purpose of a voir dire is to ascertain whether a potential juror can render a verdict solely on the basis of evidence presented and the charge of the trial court." *Wilcox v. Ford*, 813 F.2d 1140, 1150 (11th Cir. 1987).

> To exclude a prospective juror for cause, a party must demonstrate through questioning that the juror lacks impartiality. *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). That is, the party "must demonstrate that the juror in question exhibited actual bias by showing either an express admission of bias or facts demonstrating such a close connection to the present case that bias must be presumed." *United States v. Chandler*, 996 F.2d 1073, 1102 (11th Cir. 1993). Actual bias exists if a juror is not "capable and willing to decide the case solely on the facts before him." *Rogers v. McMullen*, 673 F.2d 1185, 1190 (11th Cir. 1982) (parentheses omitted).

*Bell v. United States*, 351 Fed. App'x 357, 359 (11th Cir. 2009) (footnote omitted).

The state court's order accurately recites the answers of the two jurors. (Doc. 23, Ex. 1c, pp. 143-44, 203-04, 207). Those answers indicated that the jurors were able to be fair and impartial and would render their verdict based solely on the evidence. Accordingly, Robinson has not shown that counsel performed deficiently in failing to move to strike the jurors. Because Robinson fails to demonstrate that the state court's rejection of his claim involved an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts, he is not entitled to relief on Ground Seven.

Ground Eight

The trial transcript indicates that the court conducted a jury instruction charge conference off the record before going back on the record to address the draft jury

instructions. (Doc. 23, Ex. 1g, pp. 879-80, Ex.1h, p. 883). Robinson asserts that trial counsel was ineffective in failing to request that the charge conference be placed on the record and transcribed, and in failing to inform him that he had the right to object to the charge conference being held off the record.

The state postconviction court denied his claim as untimely:

> In ground seventeen, Defendant alleges counsel was ineffective for failing to request that the charging conference be placed on the record. Defendant asserts that objections and arguments were made off the record, but they were not preserved for appellate review. Defendant raises this claim for the first time in his July 26, 2013 motion. Therefore, ground seventeen is untimely and is denied.

(Doc. 23, Ex. 9a, p. 257).

A petitioner's failure to comply with state procedural rules governing the proper presentation of a claim bars federal review of that claim in a subsequent federal habeas proceeding. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) ("This Court will not review a question of federal law decided by a state court if the decision ... rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts.").

"[A] state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). A state court's procedural ruling constitutes an independent and adequate state rule of decision if (1) the last state court rendering a judgment in the case clearly and expressly states that it is relying on a state procedural rule to resolve the federal claim without reaching the

merits of the claim, (2) the state court's decision rests solidly on state law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion" or in a "manifestly unfair manner." *Id.* (citing *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)).

A rule must be firmly established and regularly followed by state courts to constitute an independent and adequate basis. *Lee v. Kemna*, 534 U.S. 362, 376 (2002). Florida courts have held that an untimely postconviction claim will be denied. *See Bellamy v. State*, 834 So.2d 897, 897 (Fla. 5th DCA 2002) ("[T]he [Rule 3.850] motion was untimely because it was filed more than two years after the judgments and sentences . . . became final and Bellamy fails to allege any of the exceptions to the two year time limit are applicable."); *Cook v. State*, 596 So.2d 483, 484 (Fla. 1st DCA 1992) ("A motion for post-conviction relief is untimely and will not be considered if filed more than two years after the judgment and sentence become final.").

The state court's application of an independent and adequate state bar results in a procedural default of this claim.[14] Therefore, the claim can only be considered if Robinson establishes that either the cause and prejudice or fundamental miscarriage of justice exception applies to overcome the default. *See Harris v. Reed*, 489 U.S. 255, 262 (1989) ("[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show" one of these

---

[14] The state court's application of a state procedura rule precludes federal review, even though the state court alternatively considered the merits of Robinson's claim. *See Thompson v. Sec'y, Dep't ot Corr.*, 517 F.3d 1279, 1282 n.5 (11th Cir. 2008) ("That the court alternatively rejected Petitioner's claims on the merits does not disturb the procedura bar."); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994) ("[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim.").

exceptions). Robinson has not made this showing. Accordingly, Ground Eight is barred from review.

Accordingly, it is **ORDERED** that Robinson's second amended petition (Doc. 11) is **DENIED**. The Clerk is directed to enter judgment against Robinson and to close this case.

### CERTIFICATE OF APPEALABILITY AND
### LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

It is **ORDERED** that Robinson is not entitled to a certificate of appealability (COA). A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a COA must first issue. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Robinson "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Robinson has not made the requisite showing. Finally, because Robinson is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** at Tampa, Florida, on August 1, 2019.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

<u>Copies to</u>: Lee P. Robinson; Counsel of Record